J-A34012-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| LINDA M. GOETZ | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| MICHAEL A. WILLIAMS AND ANN WILLIAMS | |
| | No. 692 MDA 2015 |

Appeal from the Judgment Entered May 15, 2015
In the Court of Common Pleas of Adams County
Civil Division at No(s): 2013-SU-0000610

BEFORE: PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY PANELLA, J.               **FILED MARCH 07, 2016**

Appellant, Linda M. Goetz, appeals from the judgment entered pursuant to a non-jury verdict on her quiet title action in favor of Appellee, mortgage holder Michael A. Williams.[1] The trial court found that Linda had failed to establish any right to legal relief. After careful review, we conclude that the trial court's findings are insufficient to address the legal issues raised, and therefore vacate and remand.

This dispute has its roots in the protracted divorce between Linda and her ex-husband, Robert Goetz, who is Michael's uncle. The following

_____

[1] Linda entered a default judgment against Michael's mother, Ann Williams, thereby extinguishing Ann's mortgage against the subject property.

summary of those divorce proceedings are taken from a master in equitable distribution's report.

> The parties met in 1985; they began living together in 1987. They were married on April 26, 1991 in Frederick County, Maryland. The marriage was the second for Husband and the third for Wife. The parties separated during the marriage several times, the longest of which was December 1996 through December 2000. … The parties separated for the final time in September 2004. The instant Complaint in Divorce was filed by Wife on March 21, 2005 ….
>
> The central dispute in this matter has been the determination of what constitutes marital assets. Husband claims that all real property and assets are his sole property; Wife claims that all real property and assets are marital property. The issue arises from documents entitled "Prenuptial Agreement" and "Postnuptial Agreement" signed by the parties, and equitable considerations raised by the parties', and particularly Husband's actions and statements in prior matters before various courts, including the first divorce …; a property claim advanced by the parties … to avoid a Pennsylvania Department of Environmental Protection lien; and a bankruptcy petition filed by Husband in 2005 after the parties' final separation. … The Opinion and Order of the [trial court] dated August 15, 2008, … affirmed the validity of the Prenuptial Agreement and the invalidity and unenforceability of the Postnuptial Agreement. … Despite the above, Husband continues to claim that by virtue of the Postnuptial Agreement, Wife has no interest in any real property or the proceeds of the public auction of business related joint property and at subsequent Master's hearings spent considerable time introducing evidence intended to show ownership of assets pre-dated the marriage.
>
> On October 15, 2008, Husband having failed to pay alimony pendente lite arrearages and counsel fees under Orders of Court … in the amount of $57,496.96, Wife obtained a judgment and filed a Writ of Execution. A Sheriff's sale of construction equipment and salvage materials to satisfy the judgment was scheduled for February 26, 2009. Husband requested Wife's cooperation to obtain funds against marital property at 3380 Chambersburg Road to forestall the sale. Wife cooperated in signing four mortgages. Husband obtained $35,000.00 against

three of those mortgages, but did not obtain the remaining $25,000 against the fourth mortgage. Husband did not pay any amount to Wife. [As a result] Wife filed her Fourth Petition for Special Relief asking for [a public auction instead of a sheriff's sale,] which was scheduled for Saturday, April 18, 2009.

Report and Recommendation of Master, 1/26/11, at 1-3.[2] Of the $35,000 borrowed by Robert against 3380 Chambersburg Road, Michael provided $25,000.

Then-counsel for Robert, John A. Wolfe, Esq., deposited the checks in an escrow account. At some point after that, Attorney Wolfe withdrew from the case, and Husband retained a new lawyer, Richard K. Konkel, Esq. On April 17, 2009, Attorney Konkel disbursed the proceeds of the escrow account created by Attorney Wolfe to Robert.

At the auction on April 18, 2009, Michael signed a bid agreement with the auctioneer, Wolfe Industrial Auctions, Inc.[3] Paragraph 1 of the agreement provided that "[a]ll prospective buyers must register and receive a bidder's card." Paragraph 8 of the document provided that in the event that the purchase price was not paid, the auctioneer was entitled to recover

---

[2] As Michael was not a party to the divorce proceeding, none of the factual findings from that proceeding can be held against him. Linda submitted the Masters' Reports as exhibits in the non-jury trial. However, the trial court sustained Michael's objections to their admission. We utilize the reports merely to summarize the factual and procedural history to provide context to Linda's claims in this matter in a manner consistent with the factual record developed in the trial court.

[3] The record does not indicate any relationship between Attorney Wolfe and the auctioneer.

any losses from the buyer, including attorney's fees and court costs. At the bottom of the page, Michael's signature is identified as the signature of buyer. The number 60 is handwritten at the top of the page.

Michael's testimony regarding what happened at the auction is dependent upon the circumstances under which his testimony was taken and contradictory in certain aspects. The consistent aspects of his testimony are that he was bidder #60 at the auction. Furthermore, Michael admitted that Robert performed the bidding under bid card #60, and that Robert, and not he, had provided the funds to pay for the purchase price of all items purchased under bid card #60. Finally, it is undisputed that Robert brought $35,000 to the auction and used it towards the purchase price of the assets purchased under bid card #60.

The inconsistencies in Michael's statements under oath concern the reasons why Robert was the person making the bids at auction. When he testified on July 8, 2010, during the divorce case between Linda and Robert, Michael stated that Robert performed the bidding because "[h]e knew the history of all his equipment much more extensive[ly] than I did." N.T., 7/8/10, at 1815.[4]  As far as the reason why the items were purchased,

---

[4] Michael argues, on appeal, that this transcript was not admitted at trial. However, when Linda was questioned regarding Michael's prior testimony, the trial court stated "The [c]ourt will read the transcript."  N.T., 10/28/14, at 18.  Michael did not object, and the transcript was not one of the exhibits
*(Footnote Continued Next Page)*

Michael testified, "I was going to resell the equipment." *Id*., at 1815; 1829-1830. After the conclusion of the auction, Michael testified that Robert told him that he would pay for the purchases because Robert "was going to get my $25,000 back." *Id*., at 1835.

In contrast, during the non-jury trial in the present case on October 28, 2014, Michael testified that he did not purchase anything at the auction. *See* N.T., 10/24/14, at 59. Furthermore, he testified that Robert purchased all of the items under bid card #60 and did not give Williams any of the items purchased. *See id*.

Approximately eight months later, Michael recorded the mortgage on 3380 Chambersburg Road. The property was later sold pursuant to a sheriff's sale to satisfy Linda's claims against Robert.

The central dispute in this current litigation is the ongoing validity of the mortgage, executed by Robert and Linda, against 3380 Chambersburg Road and held by Michael. Of relevance to the current appeal, Linda argues that Robert had in fact paid off the $25,000 loan to Williams on the date of the auction by paying for the purchases.[5] The trial court found that there was no evidence to support a finding that Robert had satisfied the loan. We

_(Footnote Continued)_ ────────────

the trial court explicitly excluded from admission at the close of Linda's evidence.

[5] Linda propounded several theories for relief in her complaint. As we conclude that a remand is necessary on this issue, we need not catalogue the other theories.

- 5 -

disagree, and conclude that pursuant to the stipulations agreed to by Williams, there is an outstanding question regarding the arrangements between Michael and Robert at and after the auction.

We begin with our standard of review.

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue … concerns a question of law, our scope of review is plenary.

**Stephan v. Waldron Elec. Heating and Cooling, LLC**, 100 A.3d 660, 664-665 (Pa. Super. 2014) (citation and brackets omitted).

Here, we are concerned solely with the application of law to the following stipulated facts.

23. Michael registered as a bidder at the public auction of marital assets in the Goetz divorce that was held on April 18, 2009, and signed for bid #60.

24. The attached Wolfe Industrial Auctions, Inc. Terms of Sale is an accurate copy of the document that was signed by Michael to obtain bid #60 at the public auction of marital assets in the Goetz divorce that was held on April 18, 2009.

26. The signature on the attached Wolfe Industrial Auctions, Inc. Terms of Sale is the signature of Michael.

27. Michael successfully bid on items at the public auction of marital assets in the Goetz divorce case on April 18, 2009.

28.    Michael knew that Robert paid $35,000 on account of the items that were purchased against bid #60 at the public auction of marital assets in the Goetz divorce case on April 18, 2009.

29.    Michael paid nothing on account of the items that were bid on #60 at the public auction of marital assets in the Goetz divorce case on April 18, 2009.

30.    The attached transaction list is an accurate copy of the list of twenty-six items that were purchased on bid #60 at the public auction of marital assets in the Goetz divorce case on April 18, 2009.

31.  Michael did not transfer more than $25,000 to Robert after Linda signed the mortgage in this case.

As noted previously, the Terms of Sale document provides that Michael, as purchaser, was liable for the purchase price due for any asset purchased under his bid number. Furthermore, the attached transaction list referenced in stipulation 30 indicates that Michael, as purchaser, was liable for a total purchase price at auction of $61,240.

Under these stipulated facts, Michael was the purchaser at auction, and liable for the purchase price to Wolfe Industrial Auctions. *See Graver v. O'Reilly*, 55 Pa. Super. 505, at *3 (1913). Robert's act in settling Michael's account after the auction was in fact income to Michael in the form of retirement of the debt Michael owed Wolfe Industrial Auctions. *See*, *e.g.*, *United States v. Centennial Savings Bank FSB*, 111 S.Ct. 1512, 1518 (U.S. 1991) ("if the taxpayer is thereafter released from his obligation to repay [a debt,] the taxpayer enjoys a net increase in assets equal to the forgiven portion of the debt"); 23 Pa.C.S.A. § 4302 (providing that in

support issues, discharge of indebtedness is included as income for the debtor). Furthermore, as the party signing the Terms of Sale and identified as the buyer under bid card #60, the assets purchased at the auction were transferred to Michael's ownership as a matter of law as soon as the bid was paid. What happened next is to be the issue on remand.

There is conflicting evidence, from Michael himself, regarding what happened to the assets. If Michael's prior testimony is credited, he retained the assets for later resale for his own benefit. Furthermore, in his earlier testimony, Michael suggested that this discharge of his debt was related to his $25,000 loan to Robert. If this testimony is credited, the mortgage has been discharged.

On the other hand, if Michael's recent testimony is credited, Robert used Michael's name, and not his own, at the auction to purchase items for himself. However, this clandestine arrangement did not change the legal reality that Michael gained title to the assets purchased under his name. If somehow this testimony is credited, it is necessary for the trial court to determine the purpose of Michael's transfer of the assets to Robert. Was it a gift to Robert? Was it pursuant to an oral contract? If pursuant to an oral contract, what was the consideration to Michael for assuming the liability in the first instance? And ultimately, what effect would any of these findings have on Robert's liability to Michael pursuant to the note and mortgage?

We cannot address these issues in the absence of credibility determinations. We therefore vacate the judgment, and remand for the trial court to hold such further proceedings, if any, it deems necessary to address these issues.

Judgment vacated. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.



Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/7/2016